J-S68031-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ERIK LAMONT REED, JR. | : | |
| | : | |
| Appellant | : | No. 477 WDA 2018 |

Appeal from the Judgment of Sentence November 9, 2017
In the Court of Common Pleas of Westmoreland County Criminal Division
at No(s):  CP-65-CR-0000087-2016

BEFORE:   SHOGAN, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.:               **FILED DECEMBER 18, 2018**

Appellant Erik Lamont Reed, Jr. appeals from the judgment of sentence entered in the Court of Common Pleas of Westmoreland County following his conviction by a jury on the charges of first-degree murder and firearms not to be carried without a license.[1]   After a careful review, we affirm.

The relevant facts and procedural history are as follows: Appellant shot and killed Donald Williams, and represented by counsel, he proceeded to a jury trial on August 14, 2017.  The trial court has summarized in exhaustive and accurate detail the testimony and evidence presented at Appellant's jury trial, and we rely on the trial court's summarization for purposes of this appeal. **See** Trial Court Opinion, filed 3/1/18, at 2-20.

---

[1] 18 Pa.C.S.A. §§ 2502 and 6106, respectively.

---

\*   Former Justice specially assigned to the Superior Court.

Following the jury's guilty verdict for the crimes indicated *supra*, on November 9, 2017, the trial court sentenced Appellant to an aggregate of life in prison, and Appellant filed a timely, counseled post-sentence motion. The trial court denied Appellant's post-sentence motion on March 1, 2018, and this timely appeal followed. All Pa.R.A.P. 1925 requirements have been met.

On appeal, Appellant presents the following issues in his "Statement of Questions Involved":

   I.   Whether there was sufficient evidence to disprove justification for the verdict of guilty of murder in the first degree?

   II.  Whether the verdict was against the weight of the evidence?

   III. Did the trial court err in limiting the defense's closing argument regarding the failure of the Commonwealth to call the children of the deceased as witnesses?

   IV.  Did the trial court err in not allowing testimony from a witness who advised [Appellant's] family to "be careful" around the victim?

   V.   Did the [trial] court err by precluding testimony regarding threats made by members of the victim's family to members of [Appellant's] family?

Appellant's Brief at 4-5.[2]

Appellant challenges the sufficiency of the evidence as to his conviction for first-degree murder.[3] Specifically, Appellant contends the Commonwealth

---

[2] We have renumbered Appellant's issues for the sake of effective appellate review.

[3] Appellant does not challenge the sufficiency of the evidence as to his conviction for firearms not to be carried without a license.

failed to disprove Appellant's justification defense, *i.e.*, defense of others. In this regard, Appellant notes that both he and his stepfather, Kahil Dandridge,[4] testified they feared that Mr. Williams was going to kill Appellant's stepfather, and, in fact, Mr. Williams had threatened to "fucking kill" him. Appellant's Brief at 27.

Our standard of review is well-settled.

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

*Commonwealth v. Franklin*, 69 A.3d 719, 722 (Pa.Super. 2013) (citations and quotation marks omitted). Importantly, "the jury, which passes upon the weight and credibility of each witness's testimony, is free to believe all, part, or none of the evidence." *Commonwealth v. Ramtahal*, 613 Pa. 316, 33 A.3d 602, 607 (2011).

---

[4] At trial, Appellant referred to Mr. Dandridge as his "father;" however, in his brief, Appellant refers to him as his "stepfather."

Appellant was convicted of first-degree murder, for which the Commonwealth was required to prove beyond a reasonable doubt that: a human being was unlawfully killed, Appellant was responsible for the killing, and Appellant acted with malice and specific intent to kill. **See** **_Commonwealth v. Houser_**, 610 Pa. 264, 18 A.3d 1128 (2011).

With regard to Appellant's claim that he acted in defense of others, Pennsylvania law permits the use of force against another person in limited circumstances, such as defense of others. **See** 18 Pa.C.S.A. § 506. The defense of another relies substantially on the justification of self-defense:

> **Use of force justifiable for protection of the person**.--The use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

18 Pa.C.S.A. § 505 (bold in original).

As for defense of others, the relevant statute provides as follows:

**§ 506. Use of force for the protection of other persons**

**(a) General rule.**--The use of force upon or toward the person of another is justifiable to protect a third person when:

(1) the actor would be justified under section 505 (relating to use of force in self-protection) in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;

(2) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and

(3) the actor believes that his intervention is necessary for the protection of such other person.

**(b) Exception**.--Notwithstanding subsection (a), the actor is not obliged to retreat to any greater extent than the person whom he seeks to protect.

18 Pa.C.S. § 506(a) (bold in original).

Further,

[A]s provided by statute and as interpreted through our case law, to establish the defense of self-defense or defense of others it must be shown that: a) the slayer or the other he seeks to protect was free from fault in provoking or continuing the difficulty which resulted in the slaying; b) that the slayer must have reasonably believed that he or the other he seeks to protect was in imminent danger of death or great bodily harm, and that there was a necessity to use such force in order to save himself or the other therefrom; and c) the slayer or the other he seeks to protect did not violate any duty to retreat or to avoid the danger.

*Commonwealth v. Hornberger*, 74 A.3d 279, 284-85 (Pa.Super. 2013) (citation, emphasis, and brackets omitted). *See Commonwealth v. La*, 640 A.2d 1336, 1346 (Pa.Super. 1994) (stating that the claims of self-defense and defense of others are generally addressed in the same manner).

"In cases where [defense of others is] an issue, the Commonwealth is required to prove beyond a reasonable doubt that the defense does not apply to the situation in order to sustain the conviction." *Commonwealth v. Torres*, 564 Pa. 219, 766 A.2d 342, 345 (2001).

The Commonwealth sustains its burden [of disproving a claim of defense of others] if it proves any of the following: that the slayer was not free from fault in provoking or continuing the difficulty which resulted in the slaying; that the slayer did not reasonably believe that [another] was in imminent danger of death or great bodily harm, and that it was necessary to kill in order to save [another] therefrom; or that the slayer violated a duty to retreat or avoid the danger.

***Commonwealth v. Sepulveda***, 618 Pa. 262, 55 A.3d 1108, 1124 (2012) (citation omitted).

Here, in analyzing Appellant's sufficiency claim, and concluding the Commonwealth disproved beyond a reasonable doubt Appellant's claim of defense of others, the trial court relevantly indicated the following:

> The Commonwealth introduced sufficient evidence to disprove the defense of others beyond a reasonable doubt. While Kahil Dandridge stated that he was being choked [by Donald Williams] to such an extent that he nearly lost consciousness, there were no injuries to his neck. Moreover, Detective Gardner and Officer Schubert testified that when [Mr. Dandridge] gave them his story of what had happened during the fight, he did not inform either of them that he was being choked, or that he was in fear for his life. Officer Schubert testified that [Mr. Dandridge] informed him that "I got in a fight with him. He missed me. I hit him and nobody got shot." Moreover, Erika Johnson testified that after Donald Williams was shot, Kahil Dandridge, who testified that he nearly lost consciousness and was afraid he would lose his life after Donald Williams choked him, tried to pick Donald Williams off the ground, and asked, "Hey bro, are you okay?"
>
> While [Appellant] stated that he shot Donald Williams so that he would stop choking [Mr. Dandridge], [Appellant] testified that he did not warn Donald Williams that he had a gun, nor did he attempt to shoot him in a non-lethal location. When asked why he did not shoot him in the hand or foot instead of the chest, which [Appellant] knew contained vital organs, [Appellant] simply stated that he did not think he had time, and that he was "not thinking about where I'm going to shoot him."
>
> Jennifer Blackwell, the only non-law enforcement witness presented who was not part of [Appellant's] or [Donald Williams'] family, testified that immediately prior to hearing a gunshot, she heard a woman yell, "Erik, Erik, what is that. No, put that away. Put that down. Put that back. No, Erik." This testimony directly conflicted with much of [Appellant's] and his family's testimony. While [Appellant] testified that he did not have time to think of using non-lethal force against Donald Williams, [Ms.] Blackwell's testimony supports the notion that [Appellant] was urged by someone on the scene not to shoot Donald Williams at all, and

there was time and opportunity available to not kill him. [Appellant] also fled from the scene immediately upon the police arriving. While this evidence alone would not be sufficient to convict [Appellant], such evidence does raise an inference of guilt.

Thus, the jury's verdict, and rejection of the defense of others justification, was not based solely on disbelief of [Appellant's] testimony, and was supported by sufficient evidence. [Appellant] testified that he was aware that Donald Williams' vital organs were contained within his chest where he was shot, and that [Appellant] put a revolver against [Donald] Williams' body near the armpit and pulled the trigger.

Trial Court Opinion, filed 3/1/18, at 23-24 (citations to record omitted).

Applying our standard of review, we agree with the trial court's analysis. Specifically, viewing the evidence in the light most favorable to the Commonwealth, as verdict winner, the Commonwealth disproved that Appellant reasonably believed that another (Mr. Dandridge) was in imminent danger of death or great bodily harm and that it was necessary to kill Donald Williams in order to save Mr. Dandridge therefrom. **See Sepulveda**, **supra**. Accordingly, the evidence was sufficient to sustain Appellant's conviction for first-degree murder. **See Houser**, **supra**.

Appellant next contends the jury's verdict as to first-degree murder is against the weight of the evidence.[5] Specifically, he avers the credible evidence offered by Appellant and Mr. Dandridge establishes that Appellant reasonably believed that Mr. Dandridge was in imminent danger of being

---

[5] Appellant raised this issue in his post-sentence motion. He does not contend on appeal that the jury's verdict as to firearms not to be carried without a license is against the weight of the evidence.

choked such that it was necessary to kill Donald Williams in order to save Mr. Dandridge. He contends "the [j]ury gave such little weight to the obvious testimony of justification as to shock one's sense of justice." Appellant's Brief at 26.

When considering challenges to the weight of the evidence, we apply the following precepts. "The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none[,] or some of the evidence and to determine the credibility of the witnesses." *Commonwealth v. Talbert*, 129 A.3d 536, 545 (Pa.Super. 2015) (quotation marks and quotation omitted). Resolving contradictory testimony and questions of credibility are matters for the finder of fact. *Commonwealth v. Hopkins*, 747 A.2d 910, 917 (Pa.Super. 2000). It is well-settled that we cannot substitute our judgment for that of the trier of fact. *Talbert*, *supra*.

Moreover, appellate review of a weight claim is a review of the trial court's exercise of discretion in denying the weight challenge raised in the post-sentence motion; this Court does not review the underlying question of whether the verdict is against the weight of the evidence. *See id.*

> Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Id.* at 546 (quotation omitted). Furthermore, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* (quotation marks and quotation omitted).

Appellant requests that we re-weigh the evidence and assess the credibility of the witnesses presented at trial, a task that is beyond our scope of review. The jury, as finder of fact, had the duty to determine the credibility of the testimony and evidence presented at trial. *See Commonwealth v. Collins*, 70 A.3d 1245, 1251 (Pa.Super. 2013) (stating that "[a]n appellate court cannot substitute its judgment for that of the finder of fact"). As the trial court relevantly indicated:

> [T]here was conflicting testimony from both families in this case. Although [Appellant] testified that Donald Williams had threatened him both days prior to and during the family melee, the jury did not believe that he was in actual fear for [Mr. Dandridge's] life when he shot him. Because the jury disbelieved [Appellant's] testimony regarding his justification defense, [believed the evidence disputing the defense,] and [Appellant] admitted that he did shoot and kill Donald Williams, [the jury] found [Appellant] guilty of murder of the first degree. The verdict in this case is not so contrary to the evidence as to shock one's sense of justice. Thus, the verdict in this case was not against the weight of the evidence.

Trial Court Opinion, filed 3/1/18, at 25.

We agree with the trial court's analysis and conclude Appellant is not entitled to relief on his weight of the evidence claim. *See Talbert*, *supra*.

In his next claim, Appellant contends the trial court abused its discretion in limiting defense counsel's closing argument regarding the failure of the

Commonwealth to call the children of the deceased as witnesses. Specifically, Appellant contends that defense counsel should have been permitted to argue during closing argument that the Commonwealth's failure to call Donald Williams' two daughters, who were present during the murder, created an inference that the daughters' testimony would have been favorable to Appellant's claim of justification.[6]

Initially, we note that we review the trial court's limitation upon defense counsel's closing argument for an abuse of discretion. *Commonwealth v. Baez*, 554 Pa. 66, 720 A.2d 711, 729 (1998). It is well-settled that an attorney's closing argument is not evidence. *Id.* "Just as a prosecutor is permitted in his. . .closing argument to comment on the evidence and any reasonable inference therefrom, so may defense counsel. Additionally, defense counsel is entitled, like the prosecution, to question in closing argument, the motives and credibility of any witness." *La*, 640 A.2d at 1349.

The missing witness adverse inference rule has been summarized as follows:

> When a potential witness is available to only one of the parties at trial, and it appears this witness has special information material to the issue, and this person's testimony would not merely be cumulative, then if such party does not produce the testimony of

---

[6] At trial, Appellant requested a missing witness instruction as to Donald Williams' daughters, and the trial court denied the instruction. Further, in response to defense counsel's inquiry, the trial court ruled that defense counsel could not argue during his closing argument that the witnesses' failure to testify created an inference/presumption in favor of Appellant. N.T., 8/14-18/2018, 1111-13.

this witness, the jury may draw an inference that it would have been unfavorable.

*Commonwealth v. Manigault*, 501 Pa. 506, 462 A.2d 239, 241 (1983).

This Court has clarified at least six circumstances where a party is *not* entitled to the missing witness inference:

> 1. The witness is so hostile or prejudiced against the party expected to call him that there is a small possibility of obtaining unbiased truth;
>
> 2. The testimony of such a witness is comparatively unimportant, cumulative, or inferior to that already presented;
>
> 3. The uncalled witness is equally available to both parties;
>
> 4. There is a satisfactory explanation as to why the party failed to call such a witness;
>
> 5. The witness is not available or not within the control of the party against whom the negative inference is desired; and
>
> 6. The testimony of the uncalled witness is not within the scope of the natural interest of the party failing to produce him.

*Commonwealth v. Boyle*, 733 A.2d 633, 638 (Pa.Super. 1999) (citation omitted).

Here, the trial court concluded that Appellant was not entitled to any missing witness/favorable inference as to the absence of Donald Williams' two daughters because the witnesses were equally available to both parties. *See* Trial Court Opinion, filed 5/2/18, at 2. In fact, the trial court noted that defense counsel listed the two daughters as potential witnesses, but then did not call them. *Id.* Accordingly, the trial court ruled Appellant was not entitled to a missing witness inference. More specifically, the trial court ruled defense counsel could not argue during closing arguments that the Commonwealth's

- 11 -

failure to call Donald Williams' two daughters created an inference that the daughters' testimony would have been favorable to Appellant's claim of justification. We find no abuse of discretion. **See Baez**, **supra**.

In his next claim, Appellant contends the trial court erred in not allowing testimony from a proffered witness, Police Chief Eric Doutt, who would have testified that he advised Appellant's family to "be careful" around Donald Williams. Specifically, Appellant avers that he should have been permitted to introduce testimony from Chief Doutt that Mr. Williams had a history of violent actions so that he warned Appellant and his family to "be careful" of confrontations involving Mr. Williams. Appellant suggests Chief Doutt's testimony was relevant to establish Appellant reasonably believed that Mr. Dandridge was in danger such that Appellant's killing of Mr. Williams was justified. **See** Appellant's brief at 17.

Admissibility of evidence is within the sound discretion of the trial court and will not be disturbed absent an abuse of discretion. **See Commonwealth v. Arrington**, 624 Pa. 506, 86 A.3d 831, 842 (2014). Relevance is the threshold for admissibility of evidence. **See Commonwealth v. Cook**, 597 Pa. 572, 952 A.2d 594, 612 (2008). "Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact." **Commonwealth v. Drumheller**, 570 Pa. 117, 808 A.2d 893, 904 (2002) (citation omitted). "All relevant evidence is admissible, except as

otherwise provided by law." Pa.R.E. 402. "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Pa.R.E. 403.

Here, in explaining the basis for its ruling, the trial court relevantly indicated the following:

> The [trial court] initially notes that both defense counsel and the Commonwealth agreed that none of [Mr. Williams'] prior criminal convictions were admissible at trial. In a case in which self-defense is asserted, only those past crimes of the victim that are similar in nature and not too distant in time will be deemed probative, with the determination as to similar nature and remoteness resting within the sound discretion of the trial judge. ***Commonwealth v. Mouzon***, [617 Pa. 527,] 53 A.3d 738, 741 (2012).
>
> ***
>
> [Here, Mr. Williams'] only violent offenses were a simple assault charge in 2009, for which [he] was found not guilty, a 2000 charge for intimidation of a witness and terroristic threats, both of which were withdrawn, and a robbery conviction in 1988 for which [he] served six months probation. As all parties agreed that a 1988 robbery was not so similar in nature and too distant in time to be probative, no evidence of [Mr. Williams'] conviction was introduced.
>
> In attempting to admit Chief Doutt's testimony, the defense simultaneously agreed that [Mr. Williams'] prior convictions were not probative, while also raising the specter of a violent criminal past for the jury. Certainly, as the statement would have been elicited from a law enforcement officer, it would have raised the inference that Chief Doutt was referring to [Mr. Williams'] criminal past. The fact that Chief Doutt would have testified that he informed [Appellant's] family members to "be careful" of Donald Williams would also have raised the inference that he had a violent criminal history. The Pennsylvania Rules of Evidence properly delineate and limit the use of a victim's prior criminal history in

- 13 -

jury trials, so as not to improperly influence a jury. All parties agreed that [Mr. Williams'] criminal history was not admissible. Thus, even if the testimony was relevant, [the trial court] properly determined that the probative value of Chief Doutt's nebulous statement was substantially outweighed by the confusion it would have caused for the jury, and its tendency to draw the jury's attention away [from] its duty of weighing the evidence impartially.

Trial Court Opinion, filed 5/2/18, at 4-6.

We agree with the trial court's sound rationale and find no abuse of discretion. *See Arrington*, *supra*.

In his final claim, Appellant asserts the trial court erred in precluding testimony regarding threats made by members of Mr. Williams' family to members of Appellant's family. However, in the argument portion of his brief, Appellant simply indicates: "After careful review of the [trial court's] opinion and [t]rial [t]estimony[,] the [d]efense withdraws the [a]rgument to the question presented above." Appellant's Brief at 21. Accordingly, we decline to address this issue further.

For all of the foregoing reasons, we affirm the judgment of sentence. We direct the parties to attach a copy of the trial court's March 1, 2018, opinion, upon which we rely for the summary of the jury trial testimony and evidence, in the event of further proceedings.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/18/2018</u>

IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY,
PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA    )
                                )
            VS.                 )
                                )    No.    87 C 2016
ERIK LAMONT REED, JR.,          )
                                )
            Defendant.          )

## OPINION AND ORDER OF COURT

This matter comes before the Court for consideration of Defendant's post-sentence motions that have been filed in the above-captioned case.

## PROCEDURAL HISTORY:

The charges in this matter arise from the death of Donald Williams, which occurred in New Kensington on December 15, 2015.

Defendant was charged with one count of murder of the first degree, 18 Pa.C.S.A. §2502(a), one count of murder of the third degree, 18 Pa.C.S.A. §2502(c), and one count of firearms not to be carried without a license, 18 Pa.C.S.A. §6106(a)(1).[1] A jury trial commenced on August 14, 2017. Defendant was represented by Attorney Ralph Karsh. Defendant was found guilty of murder of the first degree and firearms not to be carried without a license. Defendant was sentenced on November 9, 2017 to life imprisonment without the possibility of parole. Attorney Karsh withdrew his appearance after

---

[1] At trial, the criminal information was amended to include one count of voluntary manslaughter, 18 Pa.C.S.A. §2503(a)(1).

1

sentencing, and the Court appointed Attorney Timothy Andrews to represent Defendant on appeal. Defendant filed post-sentence motions on November 15, 2017, and amended post-sentence motions on January 29, 2017.

## FACTUAL HISTORY

Sergeant Paul Manke of the New Kensington Police Department testified that he was on duty on December 15, 2015 during the 3:00 p.m.-11:00 p.m. shift when he received a dispatch that evening stating that a large fight had broken out at the intersection of North Street and Taylor Avenue. (TT 252).[2] As he was traveling to the scene, he received an update that shots had been fired. (TT 253). When he arrived, Officers Noble and Stanga were already present. (TT 253). Sergeant Manke noted several groups of people at the scene. He also observed two females crossing North Street, and Officer Noble performing chest compressions on Victim Donald Williams. (TT 254).

At that point, Donald Williams was lying on the northwest corner of North Street and Taylor Avenue. (TT 254). Sergeant Manke noted that he appeared to be unresponsive. (TT 254). He then began to secure the scene, and eventually took over the task of chest compressions. (TT 255). He noted that Williams was not exhibiting any signs of life; specifically, he was not breathing, and Manke could not detect a pulse. (TT 257). Shortly thereafter, emergency medical services arrived and took over Williams' care. (TT 257). Sergeant Manke related that EMS eventually ceased performing lifesaving measures on Williams, and he was pronounced dead. (TT 258). Sergeant

---

[2] Numerals in parenthesis preceded by the letters "TT" refer to specific pages of the transcript of the testimony presented at the trial of this matter, held August 14-18, 2017 before this Court, which is made a part of the record herein.

2

Manke testified that he did not locate any weapons on Williams' person, or in the surrounding area. (TT 259). Sergeant Manke also performed a search for shell casings and firearms, but was unable to locate any evidence. (TT 272).

Later that evening, Sergeant Manke learned that there was a suspect in the case, and that he had run toward 1403 Taylor Avenue, which was close to the scene. (TT 265-66). Officers later performed a sweep of the residence to ensure that no individuals were hiding inside. (TT 269). Shortly thereafter, the victim was identified as Donald Williams, and his residence was identified as 1331 Taylor Avenue, approximately 8 houses away from 1403 Taylor Avenue. (TT 270).

Clayton Paul Ondrizek testified that on December 15, 2015, he was employed as a critical care paramedic with New Kensington EMS during the 4:00-12:00 a.m. shift. At approximately 10:23 p.m., he was dispatched to an incident occurring at the intersection of North and Taylor streets in the city of New Kensington. Ondrizek stated that when he arrived at the scene, several police agencies were already present, as well as numerous bystanders. (TT 287). Ondrizek then located Donald Williams, who was lying supine on the sidewalk with officers tending to him. (TT 288). As he performed his initial assessment of Williams, Ondrizek determined that he did not have a pulse and that his pupils were non-responsive. (TT 290-91). He also noted that Williams' abdomen was extremely enlarged, indicating internal bleeding. (TT 292). When Ondrizek applied a cardiac monitor to Williams, he found that there was no electrical activity in his heart. (TT 294). Ondrizek then contacted his command physician, who instructed him to cease

3

resuscitative efforts on Williams. (TT 294). Ondrizek then determined that Williams was deceased. (TT 295). Ondrizek did not identify any weapons on Williams' person, nor in the surrounding area. (TT 295).

Deputy Coroner Sean Hribal testified that on December 15, 2005, he was called to assist in a shooting death in New Kensington at approximately 10:34 p.m. He arrived on scene at approximately 12:00 a.m. (TT 303). He examined Williams, and noted a laceration on his right cheek and an entrance gunshot wound just below the right armpit. (TT 306). He did not locate an exit wound. (TT 306). He also did not note any defensive wounds. (TT 308). Williams was transported to a local medical facility for X-rays to determine if there was a bullet inside Williams' body, prior to an autopsy. (TT 310). The tests revealed a singular foreign body located in his left shoulder blade. (TT 310-11).

Rosella Williams testified that she was married to Donald Williams for 30 years prior to his death. (TT 316). The couple also had five children together: Kaiesha, Donnell, Rosella, Doniesha, and Kiara. (TT 317). Rosella testified that in December 2015, she and her husband resided at 1331 Taylor Avenue, New Kensington with Doniesha, Kiara, and her stepdaughter Jazzmine.[3] (TT 318). She stated that all three girls were students at Valley Senior High School. (TT 318). At the time, her husband, Donald, owned his own restaurant in New Kensington, which served soul food. (TT 319).

---

[3] Rosella Williams stated that while she referred to Jazzmine as her stepdaughter, the two were not biologically related; instead, Jazzmine was her daughter's longtime friend. (TT 319).

4

Rosella testified that on December 15, 2015, Doniesha was cheering for a high school basketball game in the evening. (TT 322). She and her daughters attended the game that evening, while Donald drove them to the school and picked them up after the game ended at approximately 9:15 p.m. (TT 322). Rosella stated that shortly after they arrived home after the game, she saw Defendant and a "young lady" walking past her home. (TT 324). Rosella's daughters and Defendant and the young lady began "exchanging words," and Rosella told her daughters to go back into the house. (TT 324). She did so because: "I know how these teenagers get and just by the tones of their voices it just seemed like it might escalate into something bigger." (TT 326).

Shortly after the three girls went back into the house, they informed Rosella and Donald that they were going to walk to the convenience store down the street before it closed. (TT 329). At some point thereafter, the girls returned home. Rosella stated that "Jazzmine came into the house hysterical telling me and Donald we need to get outside." (TT 330). Rosella immediately ran outside, as she remembered that Doniesha and Kiara had been feuding with two girls who lived nearby. (TT 330). Donald was approximately two minutes behind her, putting on his shoes before he went outside. (TT 331).

When Rosella arrived at the street corner, she observed her daughters with the two girls they had been feuding with, along with Defendant, the girl he was walking with earlier in the day, and Defendant's mother (Erika Johnson) and stepfather (Kahil Dandridge). (TT 332). The girls were having a verbal altercation (TT 333). She stated: "They're just arguing back and forth, talking about who's going to beat who, who is not

5

going to beat who, who is going to do what to who." (TT 333). She also stated that when she first saw Defendant, she noticed that he had a gun in his right pocket. (TT 334). Rosella then entered into a verbal altercation with Defendant's mother. Rosella testified:

> **ADA:** What's the defendant's mom doing at this point?
> **Rosella:** Standing near voicing her opinion about me and my girls.
> **ADA:** How did you take to that?
> **Rosella:** Um, I asked her, I was like, because she said I heard about you. I referred to her and I asked her to enlighten me what did you hear about me. She replied, she said, I heard you and your girls don't do nothing but go around the town stirring up fights and getting into battles with all the kids.
>
> . . .
> **ADA:** What happened with you and his mom?
> **Rosella:** We started physically fighting.
> (TT 335-36).

Rosella admitted that she grabbed Erika Johnson's neck and choked her because she believed that she was getting ready to "jump" her daughter. At that point, all of the girls had begun fighting. (TT 337). Rosella stated that she did not observe any of the girls using weapons, although she noted that she saw her youngest daughter "swing something, but I can't figure if it was a belt." (TT 338). Rosella testified that during the melee, Donald Williams was fighting Kahil Dandridge. (TT 339). She stated: "They were fist fighting . . . I seen the father swing at Donald and Donald's body turned to the side, and then Donald got back up – not got up, but turned his body back and started swinging and punching. At some given point in time, I'm not exactly sure, the stepfather ended up on the ground and Donald was on top of him." (TT 339).

She stated both Donald Williams and Kahil Dandridge eventually fell into the bushes. (TT 342). Shortly thereafter, she heard a "pop sound" while still engaged in a fight with Erika Johnson. (TT 341). "I heard somebody say, it's a gunshot. For a minute my body froze and then I responded and I went over to my husband and he was laying -- his chest was laying on the ground forward with his head to the side . . . I went over there and was checking him to see if he was okay, and if it's a gunshot where did he get hit." (TT 343). She stated that shortly after hearing the gunshot, she observed Defendant running back to his residence. (TT 344). She also noted that he was holding a gun in his hand. (TT 344). As he was running, Rosella testified that his mother grabbed him and asked, "What did you just do?" (TT 344). She then went to check on Donald, and noted that she could not detect a pulse or any breathing. (TT 345).

Jennifer Blackwell testified that in December 2015, she was living near Defendant and the Williams's with her three sons. (TT 397). She stated that on the night of December 15, 2015, she was at home when she heard a loud fight occurring outside, with "just a lot of screaming and yelling." (TT 400). She called 9-1-1 as she feared that the fight would escalate. (TT 401). Shortly thereafter, she heard a woman yell "Erik, Erik, what is that. No, put that away. Put that down. Put that back. No, Erik." She then heard screaming and a gunshot. (TT 401). After she heard the gunshot, she again called 9-1-1. (TT 402).

Joshua Stanga, patrolman with the City of Arnold Police Department, testified that he was working the 4:00 p.m. to midnight shift on December 15, 2015 when he received a call for a large group fighting in the middle of the Taylor Avenue. He traveled to the

location to assist. (TT 418). As he was en route to the location, the dispatch was updated to note that shots had been fired. (TT 419). When he arrived at the scene, he observed two females standing over a male in the bushes. (TT 420). He cleared the scene and checked for the individual's pulse in the bushes. (TT 421). He did not detect any signs of life. (TT 423). After Sergeant Manke arrived and took over care for Donald Williams, he began to clear the scene and separate individuals. (TT 426). He then traveled to Defendant's residence and attempted to locate Defendant. (TT 429). Defendant's family was on the front porch; Officer Stanga did not note any injuries to Erika Johnson or any of the girls. He stated that Kahil Dandrige "had some cuts and blood on him." (TT 432). Erika Johnson told him that she did not know where Defendant went. (TT 429). Officer Stanga then performed a protective sweep of the residence, along with several members of the Lower Burrell and New Kensington police departments. (TT 430). Defendant, nor any other individual, was located as a result of the sweep. (TT 437).

That evening, he aided in securing a search warrant for Defendant's residence. He also interviewed Defendant's family members at the police station. (TT 439-40). Officer Stanga then issued a BOLO (be on the lookout) alert for Defendant, and informed law enforcement agencies that Defendant could be armed and dangerous. (TT 444). The next day, he traveled back to Defendant's residence at approximately 4:30 p.m. to further discuss the events of the previous day with Defendant's mother and stepfather. (TT 440). He also canvassed the immediate area, and spoke to neighbors to find any potential witnesses. (TT 441). On that date, Officer Stanga spoke to Jennifer Blackwell, who

8

described her recollections from the night of the crime. (TT 443). He also took her written statement. (TT 444).

Forensic Pathologist Cyril Wecht testified that he performed an autopsy on Donald Williams on December 16, 2015. Doctor Wecht noted two injuries on Williams: a gunshot entrance wound below the right armpit and a three-inch laceration on the left side of the face. (TT 507). Doctor Wecht noted a heavy deposit of black carbonaceous pigment around the gunshot entrance wound, and no stippling. (TT 508). Doctor Wecht testified that this indicated that it was a contact wound, meaning that the gun's muzzle was in contact with the body at the time it was fired. (TT 508). Doctor Wecht's examination of Williams' chest revealed the following:

> [T]he bullet had gone in and then it went between the 7th and 8th ribs on the right side, producing a little bit of fracturing of the bottom of the 7th rib and the top of the 8th rib, the bullet going into the interco[]stal area between the ribs, and then it went through the lower lobe of the right lung. The right lung has three lobe components, and then went across into the third thoracic verterbral body . . . At the third level down the bullet had gone down there and completely transected the spinal cord. The spinal cord is encased by a bony component of the vertebral body. It emerged from there and went through the left lung and came to rest in the left side of the chest where the bullet was recovered.
> (TT 516-17).

Doctor Wecht determined that Donald Williams' cause of death was a gunshot wound to the thorax with perforation of the right and left lung resulting in hemothorax. (TT 519).

Detective Hugh Shearer testified that on December 15, 2015, he was called to assist in the homicide investigation. (TT 547). While performing a walk-through of the

9

crime scene, Detective Shearer noted "clumps of hair out in the street, there [were] earrings, there was a lighter, there was a vehicle parked near the intersection not far away that had clumps of hair on the door handle." (TT 550). He stated that no weapons or shell casings could be located at the scene. (TT 556). Blood was also identified on the sidewalk near the hedges in which Donald Williams and Kahil Dandridge tussled. (TT 563). The vehicle near the scene was also searched, and hedge clippings were found in the backseat. (TT 566).

At approximately 3:00 a.m. on December 16, Detective Shearer traveled to the Arnold police station to photograph the injuries of the Dandridge family. (TT 580). Upon photographing Kahil Dandridge, Detective Shearer did not note any major injuries, though he stated that he noticed swelling to the right eye. (TT 584). Kahil also informed him that the blood found on the sidewalk belonged to him, and that he had blood in his nose and sinuses that he had spit up on the sidewalk. (TT 588). Based on that information, Detective Shearer also collected a DNA sample from Kahil. (TT 589).

Detective Shearer first photographed daughter Sierra Johnson. He described her injuries as follows:

> She had cuts to the interior of her mouth. She had braces in her mouth. There was some bruising on the inside front of her lip. There was also some bruising on the inside in the front where her braces were. She had scratches on the right side of her face, her right and left biceps, her left elbow, right shoulder, lower back, front of her neck, her left knee, left leg, right knee, right lower leg, and she had an impression welt in the skin that was about 2 inches by 1/2 inch[] that resembled the end of a leather belt or some type of belt that left a pattern impression on her left shoulder.
> (TT 593).

10

He also noted that all of the injuries appeared to be superficial. (TT 593).

Detective Shearer also photographed daughter Mariah Serrano. He testified that she had far fewer injuries than her sister, although he noted that she had some swelling on her lower right back from contusions. (TT 594). She also had scratches on her left eye, right hand, and right forearm. (TT 594).

It was also noted by Detective Shearer that he believed that laceration on Donald Williams' face came from the thick hedges at the crime scene, as blood was also located on some of the broken hedges. (TT 603). Detective Shearer was also present at Donald Williams' autopsy, and recovered the bullet that was recovered therein. (TT 625). He noted that the bullet was fired from a 9mm revolver. (TT 625).

The parties stipulated that on December 15, 2015, Defendant did not have a valid and lawfully issued license for carrying a firearm.

Mariah Serrano, Defendant's half-sister, testified that when she and her family moved to the Arnold/New Kensington area in 2014, she and her sister Sierra began a contentious relationship with Kiara and Doniesha Williams, who attended the same school. (TT 771). She stated that the pairs physically fought on two occasions, and that the police were called four or five times. (TT 771). She testified that while all parties were injured at some point during these fights, Doniesha and Kiara would sometimes bring males with them to the altercations, and that Doniesha and Kiara threatened to kill Mariah and her sister. (TT 772). She testified that, specifically, Doniesha and Kiara referred to them as "fucking bitches" and said "we'll kill you." (TT 772). She also stated

11

that on occasion, Defendant would walk her and her sister home out of fear of Doniesha and Kiara. (TT 773).

She testified that at approximately 9:30 p.m. on December 15, 2015, she was washing dishes when Sierra and her friend, Breanna, ran into the house, grabbed their shoes, and ran outside. (TT 775, 779). She stated that she instantly knew that something was wrong because of an incident that happened earlier in the evening wherein Doniesha had hit Defendant with a car door while he was walking down the street with his girlfriend, Rihanna. (TT 777). Mariah followed them outside along with Kahil Dandridge and Erika Johnson. (TT 779). At that point, Mariah testified that she observed Doniesha in a dark car with three or four occupants. (TT 781). She testified that Doniesha shouted: "If I have to get out of this car and beat you bitches up, I'm going to fuck you all over if I have to get out." (TT 782). Mariah stated that she then saw Kiara walking down the street toward them. (TT 783). She then pulled her belt off and began to wield it like a weapon. (TT 783). She informed Mariah: "I'm going to strangle you, I want your head and I'm going to beat you like your mother should." (TT 784).

Mariah testified that her mother sent Breanna into the house to call 9-1-1. (TT 784). She also stated that Donald and Rosella Williams arrived on the scene shortly thereafter, and that Donald Williams told Defendant, "I'm going to kill you nigger, and I'm going to beat you." (TT 788). She also stated that Donald began punching her father, Kahil Dandridge, before knocking him to the ground. (TT 788). She stated that while Kahil eventually ended up being hit, he was originally aiming for Defendant. (TT 788). She testified that at that point, both groups began to fight, and that Kiara was chasing her

12

with a belt, yelling "I'm going to beat your ass when this pops off." (TT 790). She testified that Rosella "had [Erika Johnson] by her hair and she was just punching her and she was fighting her. Over to my right Donald [Willims] and [Kahil Dandridge] had made it over to the bushes and [Williams] was choking my dad and Sierra was getting . . . jumped." (TT 791). She stated that she never saw Defendant with a gun, nor did she know that he owned one. (TT 793).

Sierra Johnson testified that she was afraid of Doniesha and Kiara Williams, and that there feuds had resulted in the police coming to their bus stop to make sure that a physical fight did not break out. (TT 852). She also testified that she would sometimes ask Defendant to accompany her when she walked outside for protection from the two girls. (TT 853). She stated that on the evening of December 15, 2015, she had walked to her friend Awaun's home in New Kensington. (TT 855). She stated that when it was time to walk home, she called her mother, Erika Johnson, and asked if Defendant could meet and walk home with her. (TT 856). Shortly thereafter, Defendant and his girlfriend, Rihanna, arrived to accompany her home. (TT 856). Defendant informed her that on his way to Awaun's home, Doniesha had tried to swing and hit them with a car door when they walked past the Williams' household. (TT 859). After the group returned home, she, Defendant, Rihanna, and Breanna walked outside to smoke cigarettes. (TT 860). She testified that at the point:

> We were standing there and a car drove up North and turned onto their side of the street. I asked my brother [Defendant] and his girlfriend, was that the car they was talking about and they said yes. We kind of stood there and they backed out and turned . . . The window was rolled down and Doniesha called

13

my brother over, that's when [Defendant's] girlfriend started walking toward the car so [Defendant] followed behind her. I didn't know how many people were in the car, so me and my friend went inside the house to get some shoes on . . . [Doniesha] was yelling at my brother and his girlfriend, telling my brother's girlfriend to shut up and, like, saying that she was going to fight her . . . Doniesha pulled out her phone and she was, like . . . get the fuck out here, it's about to go down.
(TT 859-60).

Shortly thereafter, Sierra testified that Donald Williams, Rosella Williams, Kiara, and Jazzmine arrived on the scene. (TT 863). Sierra testified that as Kiara walked down the street toward the group, she began swinging her belt in the air and exclaimed, "Get the fuck out of the car, we're going to fuck these bitches up." (TT 864). She testified that Doniesha and four males then exited the car, and the fight commenced. (TT 865). She testified that Donald Williams yelled to Defendant, "I'm going to kill you, nigger" as he attempted to punch him. (TT 866). She testified that she saw Kiara chasing her sister Mariah with a belt, and that she and Doniesha fought in the bushes. (TT 872). She stated that approximately one minute after she heard the gunshot, she was able to extricate herself from the bushes, and that the fight only ended when police arrived on the scene. (TT 877, 879).

Erika Johnson, Defendant's mother, testified that she was aware that her daughters Mariah and Sierra were feuding with Doneisha and Kiara Williams, and that on the evening of December 15, 2015, she traveled outside her home to meet with Defendant and Sierra as a result of that feud. (TT 919, 922). Specifically, she stated that Defendant called her and stated that there was "an issue" when they passed the Williams' home that

14

evening. Defendant stated "that there were threats being said and he just asked if me and Kahil could meet him to get home safely." (TT 922). She testified that she met with the group and they made it home without incident. (TT 923). She testified that Rihanna, Breanna, Defendant, and Sierra were all sitting outside on the porch when Breanna ran into the house and then ran back outside. (TT 924). At that point, "I knew there was already some words exchanged with the Williams family, so I assumed it was something that had to do with that so I ran out behind them." (TT 924).

When she walked outside, she observed "a dark-colored car in the intersection. We live right by the corner and it was shouting – the people in the car were shouting and my children were shouting things back . . ." (TT 925). Although she stated that she told her children to go back inside the house, they did not do so. (TT 927). Within minutes, Donald and Rosella Williams appeared on the scene. (TT 927). At that point, Erika and Rosella began "exchanging words" and a physical fight ensued. (TT 929). She stated that Donald Williams was "going after" Defendant, stating, "I'm going to kill you, little nigger." (TT 930). She testified that Kahil Dandridge "jumped in between that." Shortly thereafter, she stated that Donald Williams punched her in the face, as well as Defendant's girlfriend, Rihanna. (TT 930). She stated that Rihanna "flew backwards. She was only about 90 pounds soaking wet so she hit the ground." (TT 931). Although she testified that she had been punched by Donald Williams, she stated that the punch had not left any mark on her face. (TT 955).

She stated that even after she heard a gunshot, the fighting continued for minutes longer. (TT 939). She testified that she did not see who shot the gun. (TT 959). At some

15

point thereafter, Kahil tried to pick Donald Williams off the ground, and asked, "Hey bro, are you okay?" (TT 961).

After the police arrived, Erika and her family (with the exception of Defendant) walked back to their front porch. (TT 941). Erika stated that she did not know where Defendant went, nor did she see him until he turned himself in a few days later. (TT 942).

Kahil Dandrige testified that on the evening of the crime, he was relaxing after work at approximately 9 p.m. when he heard yelling and screaming coming from outside the home. (TT 984). He said that as the fights began, Donald Williams approached him and punched him in the face. (TT 988). Kahil also stated that Donald Williams stated to him: "I'm going to get this little nigger's ass behind you, I'm going to fuck him up, you have a lot of nerve walking in front of my house." (TT 989). At that point, Kahil testified that Donald Williams kept fighting him, and that he had to block attempted blows to Defendant. (TT 989). He stated:

> At that time I got up and I knocked him into the bushes where
> he landed on top of me. He had one of his arms across my
> neck. He said, I'm going to fuck you up. After I fuck you up
> I'm going to get up and I am going to beat the shit out of that
> little nigger behind you. I'm going to take care of you first.
> All I see is black. I see a tunnel and little light of tunnel. I'm
> trying to force him off of me . . . I had someone on top of me
> choking my life away. Then just as everything was starting to
> get blurry and dark, my situation got lighter and Mr. Donald .
> . . it felt like he just gave up on it.
> (TT 990-91).

He stated that at some point while Donald Williams' forearm was on his throat, he attempted to call out for help. The Commonwealth asked:

16

> **ADA:** At what point were you yelling out for help with his arm on your throat?
>
> **Kahil:** Well, I'm yelling out help and it's coming out more along the lines of as if someone is choking you, like, help, (indicating) like that.
>
> **ADA:** You're not able to breathe but you're able to speak?
>
> **Kahil:** Whatever air I had I was yelling out. I couldn't get this man off of my chest.
>
> . . .
>
> **ADA:** Well, let me ask you this. Have you ever been choked?
>
> **Kahil:** I've seen people choke[d]. Usually what happens is they can't talk.
>
> (TT 1008-09).

Kahil testified that he never heard a gunshot. (TT 995). He stated that there were no visible marks or injuries to his neck from the fight. (TT 1018). Kahil also testified that he did not recall officers coming to his home the day after the crime; specifically, he stated "I don't remember the next day." (TT 1015).

Defendant testified that Mariah and Sierra had informed him that they were scared of Kiara and Doniesha. (TT 1044). He stated that he would walk his sisters home "every day" as a result of that fear. (TT 1044). Defendant also stated that a week before the crime, he had seen Donald Williams while he and Rhianna were walking to the store. He related:

> As we are walking past [the Williams' house], Donald [] is outside. He is on the sidewalk. We're walking past and he is just staring at us. He didn't say anything to us. We didn't say anything to him. We walk past the house, like, a block away and then I see a car flying down the street towards us. It was a silver truck. He got in the truck. When the truck got on us Donald hops out of the car with a gun. He is screaming, I'm from the Hill District, I will hurt you, I will fucking kill you. When he said that to me and Rihanna we just kept walking. He hopped in the car. He got back in his car and he just was

17

screaming out the window, I'll hurt you little boy, you don't know who I am. We kept walking and he eventually just drove off.
(TT 1048-49).

Defendant testified that when the fight broke out on the evening of December 15, 2015, Donald arrived at the scene by walking up the street and exclaiming "I'm going to fucking kill one of you all." (TT 1059). At that point, Defendant stated that Kahil Dandrige stopped Donald from harming him, and Kahil and Donald began to fight.[4] (TT 1060). While the fight was ongoing, Defendant "was watching everything unfold." (TT 1061). Defendant stated that he had a .38 Dillinger [sic] because when he first moved to New Kensington, someone had given it to him. (TT 1063). He stated: "I'm not from this area. New Kensington is a dangerous neighborhood. There's a lot of criminal activity. I just had the gun. I just had it to protect myself." (TT 1063).

At some point in the melee, Defendant approached Kahil Dandrige and Donald Williams. He testified Donald Williams was choking Kahil Dandrige, and saying, "I'm going to fucking kill you, I'm going to kill you." (TT 1064). He stated that he attempted to pull Donald Williams off of Kahil Dandrige, but was unsuccessful. (TT 1064). He further testified:

> I seen my dad. He started moving slower and slower. I don't
> know. I'm asking Donald to – I'm trying to pull him off but I
> can't pull him off. I had a gun in my pocket. I pulled the gun
> and I shot Donald just to get him off my dad.
> (TT 1065).

---

[4] The Court notes that although Defendant referred to Kahil Dandridge as his father, Defendant stated that he is not biologically related to him, and Kahil was not married to Defendant's mother, Erika Johnson, at the time of the offense. (TT 979, 1083).

After Defendant shot Donald Williams, he attempted to break up some of the other fights. (TT 1066). He stated that when he saw the police coming, he "just ran." (TT 1066). Defendant turned himself in a few days later at the Arnold Police Department. (TT 1067).

The Commonwealth inquired as to whether Defendant took any steps to protect his father using non-lethal force prior to shooting him. The relevant exchange is as follows:

> **ADA:** Did you pistol whip Donald in the back of the head?
> **Defendant:** No. As soon as I pulled it out I just shot him. It happened fast.
> **ADA:** So you didn't hit him in the back of the head with a gun?
> **Defendant:** No.
> **ADA:** You didn't say, hey, Donald, I have a gun?
> **Defendant:** He – I didn't say that.
> **ADA:** Did you shoot one in the air like a cowboy?
> **Defendant:** No, I – at that moment I was trying to get Donald off my dad. I didn't have time to think about – I didn't have the time to think about that at all. I was trying to get him off my dad.
>
> . . .
>
> **ADA:** Did you shoot him in the leg?
> **Defendant:** No, I shot him in the side.
>
> . . .
>
> **ADA:** The gun is touching Donald?
> **Defendant:** Yes.
> **ADA:** So you could choose wherever you wanted to put that gun on his body, right?
> **Defendant:** I didn't . . . I felt like I didn't have time.
> **ADA:** You didn't have time to shoot him in the foot?
> **Defendant:** I wasn't thinking about where I'm going to shoot him. I was just trying to get him off my dad.
> (TT 1085-87).

Gary Schubert, a retired police officer for the City of New Kensington Police Department, testified that he spoke to Kahil Dandridge on the night of the crime after he

19

was dispatched to aid in the investigation. He testified that when he asked what had happened, Kahil:

> [l]ooked over at the sidewalk, the gentleman was laying down. He said that this guy's daughter came up merely to start some shit, then a fight broke out, and then he came up and got involved in the fight. That's when I got up. I got in a fight with him. He missed me. I hit him and nobody got shot. (TT 1096).

Schubert stated that Kahil never mentioned being choked. (TT 1096).

Westmoreland County Detective Randy Gardner testified that he interviewed Kahil Dandridge at the Arnold Police Station shortly after the crime occurred. (TT 1101-02). He stated that at no point did Kahil inform him that he had been choked by Donald Williams, or that he believed his life was in danger. (TT 1102).

In his post-sentence motions, Defendant avers that there was not sufficient evidence to convict him of first degree murder, and, in the alternative, that the jury's verdict was against the weight of the evidence. Defendant also argues that "the Court erred in refusing to allow the Defendant and/or his witnesses to outline specific threats and details of incidents of altercations between the Defendant's family and the victim's family in the [preceding] months prior to the death of the victim."

## ANALYSIS:

### I.  WHETHER THERE WAS SUFFICIENT EVIDENCE TO CONVICT DEFENDANT OF MURDER OF THE FIRST DEGREE?

Defendant first avers that the jury did not have sufficient evidence to convict him of first degree murder. In reviewing a sufficiency of the evidence claim, a court must:

20

[D]etermine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail.

*Comm. v. Feliciano*, 67 A.3d 19, 23-24 (Pa.Super.2013).

Further, the evidence presented at trial need not preclude every possibility of innocence. The Superior Court in *Feliciano* established that:

[T]he fact-finder is free to believe all, part, or none of the evidence presented. It is not within the province of this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. The Commonwealth's burden may be met by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. Additionally, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.

*Id.*

To convict a defendant of first degree murder, the Commonwealth must prove: a human being was unlawfully killed; the defendant was responsible for the killing; and the defendant acted with malice and a specific intent to kill. *See* 18 Pa.C.S. § 2502(a); *Comm. v. Houser*, 18 A.3d 1128 (Pa. 2011). The Commonwealth may use solely circumstantial evidence to prove a killing was intentional, and the fact-finder "may infer that the defendant had the specific intent to kill the victim based on the defendant's use of a deadly weapon upon a vital part of the victim's body." *Houser*, 18 A.3d at 1133-34. Moreover, while evidence of flight alone is not sufficient to convict one of a crime, such evidence is relevant and admissible to establish an inference of guilt. *Comm v. Gorby*, 588 A.2d 902 (Pa. 1991).

21

Here, Defendant introduced evidence of a justification defense: specifically, defense of others. When the defendant introduces such evidence, the Commonwealth bears the burden of disproving the defense beyond a reasonable doubt. *Comm. v. Torres*, 766 A.2d 342, 345 (Pa. 2001). "[T]he Commonwealth cannot sustain its burden of proof solely on the factfinder's disbelief of the defendant's testimony. The 'disbelief of a denial does not, taken alone, afford affirmative proof that the denied fact existed so as to satisfy a proponent's burden of proving that fact.' " *Id.* (quoting *Comm. v. Graham*, 596 A.2d 1117, 1118 (Pa. 1991)). The Commonwealth can negate a self-defense or defense of others claim if it proves the defendant did not reasonably believe he was in imminent danger of death or great bodily injury and it was necessary to use deadly force to save himself or another from that danger. *Comm. v. Sepulveda*, 55 A.3d 1108, 1124 (Pa. 2012). Likewise, the Commonwealth can negate the self-defense claim by proving the defendant "used greater force than was reasonably necessary to protect against death or serious bodily injury." *Comm. v. Truong*, 36 A.3d 592, 599 (Pa.Super. 2012)

The Crimes Code details that the use of force for the protection of other persons is justified where: (1) the actor would be justified . . . in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect;[5] (2) under the circumstances as the actor believes them to be, the person whom he seeks to protect would be justified in using such protective force; and (3) the actor believes that his intervention is necessary for the protection of such other person. *18 Pa.C.S.A. § 506.*

---

[5] The relevant portion of 18 Pa.C.S.A. §505 (a) reads: the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion.

22

The Commonwealth introduced sufficient evidence to disprove the defense of others beyond a reasonable doubt. While Kahil Dandrige stated that he was being choked to such an extent that he nearly lost consciousness, there were no injuries to his neck. (TT 1018). Moreover, Detective Gardner and Officer Schubert testified that when Kahil gave them his story of what had happened during the fight, he did not inform either of them that he was being choked, or that he was in fear for his life. Officer Schubert testified that Kahil informed him that "I got in a fight with him. He missed me. I hit him and nobody got shot." (TT 1096). Moreover, Erika Johnson testified that after Donald Williams was shot, Kahil Dandridge, who testified that he nearly lost consciousness and was afraid he would lose his life after Donald Williams choked him, tried to pick Donald Williams off the ground, and asked, "Hey bro, are you okay?" (TT 961).

While Defendant stated that he shot Donald Williams so that he would stop choking Kahil, Defendant testified that he did not warn Donald Williams that he had a gun, nor did he attempt to shoot him in a non-lethal location. (TT 1086-88). When asked why he did not shoot him in the hand or foot instead of the chest, which Defendant knew contained vital organs, Defendant simply stated that he did not think he had time, and that he was "not thinking about where I'm going to shoot him." (TT 1086-87).

Jennifer Blackwell, the only non-law enforcement witness presented who was not part of Defendant or Victim's family, testified that immediately prior to hearing a gunshot, she heard a woman yell, "Erik, Erik, what is that. No, put that away. Put that down. Put that back. No, Erik." (TT 402). This testimony directly conflicted with much

23

of Defendant and his family's testimony. While Defendant testified that he did not have time to think of using non-lethal force against Donald Williams, Blackwell's testimony supports the notion that Defendant was urged by someone on the scene not to shoot Donald Williams at all, and that there was time and opportunity available to not kill him. Defendant also fled from the scene immediately upon the police arriving. While this evidence alone would not be sufficient to convict Defendant, such evidence does raise an inference of guilt.

Thus, the jury's verdict, and rejection of the defense of others justification, was not based solely on disbelief of Defendant's testimony, and was supported by sufficient evidence. Defendant testified that he was aware that Donald Williams' vital organs were contained within his chest where he was shot, and that he put a revolver against Williams' body near the armpit and pulled the trigger.

## II. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE?

Defendant next alleges that the guilty verdict was against the weight of the evidence. When a defendant raises a weight of the evidence claim, it is a trial court's role to determine whether "notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *In re J.B.*, 106 A.3d 76, 95 (Pa. 2014). A trial court should award a new trial if the verdict of the fact-finder "is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." *Id.* Moreover, "[a] weight of the evidence claim concedes that the

24

evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice." *Comm. v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013).

The Court notes that "the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence." *Comm. v. Diggs*, 949 A.2d 873, 878 (Pa. 2008); *see also Comm. v. Cousar*, 928 A.2d 1025, 1032-33 (Pa. 2007).

As noted, *supra*, there was conflicting testimony from both families in this case. Although Defendant testified that Donald Williams had threatened him both days prior to and during the family melee, the jury did not believe that he was in actual fear for his step-father's life when he shot him. Because the jury disbelieved Defendant's testimony regarding his justification defense, and Defendant admitted that he did shoot and kill Donald Williams, it found Defendant guilty of murder of the first degree. The verdict in this case is not so contrary to the evidence as to shock one's sense of justice. Thus, the verdict in this case was not against the weight of the evidence.

## III. WHETHER THE COURT ERRED BY NOT ADMITTING TESTIMONY FROM DEFENDANT AND HIS FAMILY OUTLINING SPECIFIC THREATS FROM VICTIM'S FAMILY?

Last, Defendant avers that defense witnesses should have been able to testify about a wide range of arguments between the feuding girls of both families in the months preceding the death of Donald Williams. Prior to the start of the trial, Attorney Karsh stated that he wanted to introduce testimony from Defendant's sisters that "bad blood

25

almost immediately ensued." (TT 202). He stated that they would testify that Mariah was having a relationship with Doniesha's boyfriend, and this caused fights to ensure on Taylor Avenue and at school. (TT 202). He further stated that Defendant "was involved in vocal altercations with threatening language with the sisters and friends of theirs who drove by in vehicles yelling various epithets and threats." (TT 202). The court stated that the fact that "bad blood" existed between the families was relevant to the defense of justification, but elaborated:

> **The Court:** . . . we don't need every single word that was said in these altercations, just that there were altercations. I'm sure you don't intend to do that. We're not going into a trial within a trial. You can certainly elicit the fact that there was bad blood, as you said, between your client's siblings and the children of Mr. Williams. You can do that.
> (TT 204).

Later in the trial, defense counsel sought to introduce testimony from Erika Johnson stating that there was prior contact between herself and Rosella Wiliams, and that Rosella told her that she would kill her. (TT 723). Attorney Karsh stated that Erika Johnson told Defendant about this interaction. (TT 729). The Court responded that the defense could introduce testimony from Erika Johnson that there was animus between the girls. (TT 735). It also stated that she could not relate that Rosella told her that she would kill her, as it was not relevant since Rosella was not a victim in the case.

At trial, evidence was introduced that there was a great deal of animus between the girls of the two families. Mariah Serrano testified that the pairs physically fought on two occasions, and that the police were called four or five times. (TT 771). She testified that

26

Doniesha and Kiara threatened to kill Mariah and her sister. (TT 772). She testified that, specifically, Doniesha and Kiara referred to them as "fucking bitches" and said "we'll kill you." (TT 772). She also stated that on occasion, Defendant would walk her and her sister home out of fear of Doniesha and Kiara. (TT 773). Sierra Johnson also testified to the physical feuds which occurred between the girls.

Defendant testified that Mariah and Sierra had informed him that they were scared of Kiara and Doniesha. (TT 1044). He stated that he would walk his sisters home "every day" because his sisters were afraid of the girls (TT 1044).

It is well-established that:

> The admission of evidence is a matter vested within the sound discretion of the trial court, and such a decision shall be reversed only upon a showing that the trial court abused its discretion. In determining whether evidence should be admitted, the trial court must weigh the relevant and probative value of the evidence against the prejudicial impact of the evidence. Evidence is relevant if it logically tends to establish a material fact in the case or tends to support a reasonable inference regarding a material fact. Although a court may find that evidence is relevant, the court may nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact.
> *Comm. v. Weakley*, 972 A.2d 1182, 1188 (Pa.Super. 2009) (quoting *Comm. v. Reid*, 811 A.2d 530, 550 (Pa. 2002)).

Further, "an abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." The threshold inquiry with admission of evidence is whether the evidence is relevant. "Evidence is relevant if it logically tends to establish a material

27

fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Comm. v. Spiewak*, 617 A.2d 696, 699 (Pa. 1992).

In this case, the Court permitted the admission of a plethora of evidence regarding the relationship between the families of Defendant and Victim, as discussed, *supra*. It determined, however, that specific evidence (*e.g.* that Mariah was in a relationship with Doniesha's boyfriend, or that Rosella Williams previously told Erika Johnson that she would kill her) was not relevant to the case. The Court elaborated that the main issue in the case was whether Defendant reasonably believed that Kahil Dandridge was at risk of death or grave bodily injury during his fight with Kahil Dandridge. The fact that Rosella Williams had threatened Erika Johnson did not make Defendant's specific fear of Donald Williams more or less probable, nor did specific incidents between the girls that did not involve Donald Williams. Had the Victim in the case been Doniesha or Kiara Williams, certainly, the Court would have permitted testimony regarding particular occurrences involving the girls; similarly, if Rosella Williams been the Victim, her threats toward Erika Johnson (with Defendant's knowledge) would have been relevant. As the testimony deemed inadmissible was not relevant, the Court did not err or abuse its discretion.

## IN THE COURT OF COMMON PLEAS OF WESTMORELAND COUNTY, PENNSYLVANIA – CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
)
VS. )
) No. 87 C 2016
ERIK LAMONT REED, JR., )
)
Defendant. )

### ORDER OF COURT

**AND NOW**, this _____ day of March, 2018, for the reasons set forth in the preceding Opinion, Defendant's post-sentence motions are hereby **DENIED**.

The Defendant is notified that any appeal to the Superior Court of Pennsylvania from this court's denial of his post-sentence motions must be filed within thirty (30) days from the date of this Order of Court. If the Defendant chooses to appeal the denial of the Post Sentence Motions, the Defendant will continue to be represented by Attorney Timothy Andrews.

**BY THE COURT:**

_____, J.
Rita Donovan Hathaway, President Judge

**ATTEST:**

_____
Clerk of Courts

c.c. File
Peter Caravello, Esq., Assistant District Attorney
Timothy Andrews, Esq., Counsel for Defendant
Pamela Niederheiser, Esq., Court Administrator's Office

29